LANIER, Judge.
Charles Owens was charged by a bill of information with attempted armed robbery. La.R.S. 14:64 and 14:27. He pled not guilty and, after a jury trial, was convicted of the responsive verdict of attempted first degree robbery. La.C.Cr.P. art. 814(23); La. R.S. 14:64.1. Owens was sentenced to be committed to the Louisiana Department of Corrections for a period of five years at hard labor without benefit of parole, probation, or suspension of sentence. This appeal followed.
FACTS
In September of 1985, Loretta Carter and Charles Owens lived together in a “common law” marriage in Carter’s trailer which was located in the Darrow community of Ascension Parish, Louisiana. Four or five days prior to September 22, 1985, Carter’s brother, David Wayne Lewis, came to Carter’s trailer to stay for several days with Carter and Owens.
On the morning of September 22, 1985, David Lewis entered Sherman Percy’s Grocery Store (also referred to as Brown’s Store) in the Hillaryville community of Ascension Parish, shortly after Percy opened for business. Lewis told Percy that he wanted a pound of ham roll. As Percy walked from behind a counter to prepare the order, Lewis struck him twice on the head with a wrench. When Lewis saw that Percy was not knocked out, he panicked and ran out of the store with Percy in pursuit. Shortly thereafter, Bruce C. Brown (the victim’s nephew) drove up in his father’s pickup truck. The victim pointed toward Lewis and yelled to Bruce to stop Lewis. Bruce began pursuing him. As Bruce turned the pickup truck into the street entrance of Astroland Subdivision *705 (which was about fifty yards from the store), Lewis ran to and got inside of Owens’ car. As Owens began driving away with Lewis inside his car, Bruce stopped his father’s truck in the middle of the street, pulled out a shotgun and told them to stop. Owens stopped the car. Bruce told Lewis to get out of the car and told Owens that he was not interested in him. When Lewis attempted to escape, Bruce unleashed his pitt bull terrier on him. Lewis ran into some grass and jumped a fence. The dog’s collar got caught in the fence stopping its pursuit. Bruce, however, continued to pursue Lewis. Bruce again stopped Lewis. Lewis refused to comply with Bruce’s order to wait for the arrival of the police, and Bruce shot Lewis in the leg. In the meantime, Owens parked his car in front of the store.
At 8:28 a.m. on September 22, 1985, Detective Benny Delaune of the Ascension Parish Sheriff’s Office arrived at Percy’s store as an ambulance was taking Lewis away. Delaune and other deputies started talking to potential witnesses. One of these was Owens. Delaune drove Owens to the sheriff's office. Other potential witnesses were brought to the sheriff’s office by other deputies. At 8:45 a.m. on September 22, 1985, Delaune commenced taking a written statement from Owens. Owens told Delaune that he (Owens) was cleaning his parked car at the entrance of Astroland Subdivision (about a block away from Percy’s store) when an unidentified black man came running up to him and threatened him with a wrench. The man made Owens get in his car and told him to drive off. Owens said he did not know the black man. Bruce Brown pulled up in a truck, pulled out a shotgun and told the man to get out of Owens’ car. Owens said when the man left the car he (Owens) also left. After Owens finished giving his statement, he was released to return home.
The ambulance took Lewis to the East Ascension Hospital in Gonzales, Louisiana, for treatment of the shotgun wound to his leg. Delaune first questioned Lewis at the East Ascension Hospital on September 23, 1985. Lewis admitted his guilt and said he committed the crime because he was hungry. When Delaune asked Lewis if Owens was involved, Lewis said no. Later that day, Lewis was transferred to the Earl K. Long Hospital. Delaune questioned Lewis a second time that day at the Earl K. Long Hospital, and Lewis told Delaune that he and Owens planned the robbery together and Owens drew a diagram of the store for Lewis to use.
Delaune obtained a warrant for Owens’ arrest on September 23, 1985. Delaune arrested Owens on September 24, 1985. After the arrest, Owens gave an oral statement to Delaune in which he (Owens) admitted that he knew Lewis because Lewis was Carter’s brother. However, in all other respects, Owens reaffirmed his initial statement to Delaune.
On September 23, 1985, at 7:25 p.m., Delaune took the following statement from Loretta Carter:
On 9-21-85 in my presence I heard David Lewis and Charles Owens talking about robbing Brown’s Grocery. It was decided that David Lewis would go in and rob the man while Charles waited in the car. Charles drew David diagrams of the inside of the store and told him where the money was kept.
Prior to Owens’ trial, Lewis negotiated a plea bargain with the state whereby he agreed to plead guilty to attempted armed robbery in return for a sentence of 2½ years at hard labor. Lewis also agreed to testify for the state at Owens’ trial. At the time of Owens’ trial, Lewis had not been sentenced.
CORROBORATION OF ACCOMPLICE BY PRIOR CONSISTENT STATEMENT
In his only assignment of error, Owens contends the trial court erred “by allowing the prosecutor to bolster the general credibility of its principal witness through the hearsay admission of a so-called prior consistent statement.”

Facts Surrounding Ruling on Admissibility of Evidence

At a preliminary examination held on December 3, 1985, Loretta Carter admitted *706 she signed the statement given to Delaune but asserted the statement was coerced from her by threats and only reflected things that were told to her earlier that day (September 23, 1985) by David Lewis (and were not things of which she had personal knowledge). In particular, she asserted the officer taking the statement (Delaune) threatened to arrest her for possession of marijuana and take away her child if the statement were not given.
At the trial, Lewis was the state’s first and principal witness. Lewis testified he went to visit Carter and Owens four or five days prior to the attempted robbery. On Saturday, September 21, 1985, Lewis and Owens started talking about committing a robbery because both were broke and needed money. After considering several alternatives, Lewis and Owens finally decided on Percy’s store. Lewis did not know anything about the store so Owens, who was familiar with it, drew a diagram for Lewis and told him Percy kept his money in a bag under the store counter. It was decided that Lewis would commit the offense because he was unknown in the neighborhood and Owens was known. Owens provided Lewis with a jumpsuit to hide the color and type of his clothes, a wool cap to cover his hair and a pair of gloves so he would leave no fingerprints. Owens and Lewis planned to rob the store on Sunday morning when it opened. Owens would drive Lewis from Carter’s trailer to the store, Lewis would get out of the car and simulate using a pay phone while waiting for Percy to open the store, and Owens would wait for Lewis in his car. Owens gave Lewis a socket wrench to use in committing the robbery. Lewis would ask Percy for some meat and, when Percy would turn to fill the order, Lewis would knock Percy unconscious with the wrench, take the money bag and escape with Owens in Owens’ car. On direct and cross-examination, Lewis admitted giving the contradictory statement to Delaune that Owens was not involved in the crime. Lewis also admitted a prior conviction for theft and explained his plea bargain with the state.
Loretta Carter was the second witness called by the state at Owens' trial. Her appearance commenced with a hearing out of the presence of the jury to demonstrate that she was a hostile witness. During the hearing, Carter reasserted what she had said at the preliminary examination, that is, that she did not give the statement voluntarily, she was threatened with arrest and loss of her child, and she only repeated in the statement what she had been told by her brother, Lewis. Carter again asserted she had no personal knowledge of the facts contained in her September 23, 1985 statement. After Carter completed her testimony at the hearing, the state requested permission “to ask her [Carter] in the presence of the Jury if she made this statement and introduce the statement into evidence for the Jury to give it whatever weight it deems to give it[.]” The trial court denied this request.
After the request was denied, and still out of the presence of the jury, the following exchange occurred between the state (Mr. Tureau), counsel for the defendant (Mr. Lemann) and the trial court judge:
MR. TUREAU: No, Your Honor, we can proceed with other witnesses. In fact, Your Honor, we can get this out before we get started so there is no problem with this. I have questions for this witness other than questions trying to ask her about this statement. What I intend to ask her is if it is true that she talked to her brother the day—
THE COURT: Well, I’ll let you ask her those things, but I, you know—
MR. TUREAU: —the day of the robbery or the next day and if her brother told her the day of the robbery or the next day.
THE COURT: This ruling only applies to this statement.
MR. LEMANN: But wait just a minute, as a hearsay objection, Your Honor, he can’t now, through hearsay, seek to corroborate a prior witness. He can’t through this witness now ask this witness whether or not some other witness told her anything, that’s hearsay.
THE COURT: We’ll rule on that when it comes up, but if you want to continue to call this witness and ask her other ques *707 tions not related to this statement we will let you do that.
MR. TUREAU: Well, what I will ask her if it’s true that when she talked to her brother that he told her at that time that he and Charles Owens planned the robbery of Brown’s Grocery Store. If her brother told her at that time that it was decided by David Lewis and Charles Owens that David Lewis would be the one to go in the store and if her brother told her that Charles Owens drew the diagrams of the store; those are the questions that I will specifically ask her.
MR. LEMANN: I would right now object because even the asking of those questions are prejudicial and that calls for third-hand hearsay. He’s asking her—
MR. TUREAU: She’s already corroborated that that’s what happened.
MR. LEMANN: Out of the presence of the Jury and I have — but you can’t — he can’t ask this witness whether or not David told her that David and him had conversations about anything. It is rank hearsay.
MR. TUREAU: He’s saying that my man is not credible, my lead off witness, Your Honor. This corroborates his testimony that he said the same thing the day after or the day of the robbery that he’s telling the Jury today, Your Honor. Credibility is the issue. It leads to the man’s credibility. It’s corroborative, he’s here, and it lends credibility to his testimony, Judge.
THE COURT: I’ll let you go into that.
MR. LEMANN: Well, I want to note my objection at this point for the Record. [Emphasis added.]
The Jury was returned and the state proceeded to question Carter. Carter testified she talked to Lewis at the Earl K. Long Hospital, and Lewis told her that he and Owens planned the robbery, there was a diagram involved and Owens and Lewis decided that Lewis would go in the store.

Legal Arguments of Owens

Owens contends that Carter’s testimony about Lewis’ prior consistent statement is inadmissible because (1) “Lewis’ hearsay statement to Carter was made at a suspicious time”, (2) “the defense’s assault upon Lewis during cross-examination was not directed to a particular fact, but rather related to his general credibility” and (3) “it was improper for the prosecution to bolster Lewis’ general credibility with the hearsay statement made ‘subsequent’ to the initial statement”, citing La.R.S. 15:496 and 497 and State v. Benton, 453 So.2d 993 (La.App. 1st Cir.1984), writ denied, 457 So.2d 17 (La.1984).[1]

Applicable Law

Generally, a witness cannot be corroborated or impeached before he has been sworn and testimony establishing the credibility of a witness is not admissible until the witness’ credibility has been attacked. La.R.S. 15:484. An exception to this rule is *708 found in La.R.S. 15:485, which provides as follows:
Whenever a witness has been impeached or contradicted, or his character or credibility been assailed, corroborative testimony is admissible, and the testimony of an accomplice may be corroborated even before it is attacked. [Emphasis added.]
The credibility of an accomplice called as a witness by the state is inherently subject to question. Pugh and McClelland, The Work of the Louisiana Appellate Courts for the 1976-1977 Term — Evidence, 38 La. L.Rev. 567, 579-580 (1978). For example, if the state’s case relies on the testimony of an accomplice, the trial court should instruct the jury to treat such testimony with caution, unless there is material corroboration of the accomplice’s testimony. State v. Schaffner, 398 So.2d 1032 (La.1981). Because the credibility of an accomplice is inherently subject to question, La.R.S. 15:485 authorizes an accomplice’s testimony to be corroborated before it has been attacked as an exception to the contrary general rule. In this procedural posture, the corroborative evidence is offered to bolster the testimony of the accomplice so it will bear more weight; it is not offered to rehabilitate the accomplice because the accomplice has not been impeached. Comment, Rehabilitation of Witnesses in Louisiana, 12 Tul.L.Rev. 286, nn 2 and 4 at 286-287 (1938). Stated another way, impeachment is not a necessary prerequisite for the admissibility of evidence that corroborates the testimony of an accomplice.
A prior consistent statement is relevant evidence to corroborate (bolster) the testimony of an accomplice. A prior consistent statement is circumstantial corroborative evidence from which it reasonably may be inferred that the accomplice’s present testimony is true. Cf. Bender, Hearsay Handbook, § 2.14 Prior Consistent Statement of Witness, pp 49-55 (2d Ed.1983). Thus, in the instant case, because Owens was alleged to be an accomplice with Lewis, the trial court’s ruling was correct based on La.R.S. 15:485. Cf. State v. Kelly, 237 La. 956, 112 So.2d 674 (1959).
La.R.S. 15:496 provides as follows:
When the testimony of a witness has been assailed as to a particular fact stated by him, similar prior statements, made at an unsuspicious time, may be received to corroborate his testimony.
La.R.S. 15:497 provides as follows:
Evidence of former consistent statements is inadmissible to sustain a witness who has been impeached by proof of former inconsistent statements, unless his testimony be charged to have been given under the influence of some improper or interested motive, or to be a recent fabrication, in which case, in order to repel such imputation, it is proper to show that the witness made a similar statement at a time when the supposed motive did not exist and the effect of such statement could not be foreseen. But when a witness has been impeached by evidence of declarations inconsistent with his testimony, he can not be corroborated by statements made subsequent to such declarations.
La.R.S. 15:496 and 497 apply when prior consistent statements are intended for use to rehabilitate the credibility of a witness after the witness’ credibility has been assailed. La.R.S. 15:496 and 497 establish the requisite foundations which must be laid by a party who wishes to use a prior consistent statement for the purpose of rehabilitation. State v. Marcal, 388 So.2d 656 (La.1980). La.R.S. 15:497 provides the foundation in the specific instance where the witness has been impeached by a prior inconsistent statement; in that case, the party offering the evidence must show (1) the opposing party is claiming the witness’ current testimony is being given under the influence of an improper or interested motive, or the testimony is a recent fabrication, (2) the prior consistent statement was made at a time when the motive did not exist and the effect of such statement could not be foreseen, and (3) the statement was not made subsequent to the prior *709 inconsistent statement.[2] La.R.S. 15:496 provides the foundation for the admission of a prior consistent statement where the witness’ credibility has been assailed on grounds other than a prior inconsistent statement; in that case the party offering the evidence must only show that (1) the witness’ credibility has been assailed as to a particular fact[3] (and not in general), and (2) the prior consistent statement was made at an unsuspicious time.
When La.R.S. 15:484 and 485 are construed together with La.R.S. 15:496 and 497, it is evident that the special provision for corroboration of an accomplice’s testimony in La.R.S. 15:485 is an exception to the general rules for the use of prior consistent statements in the testimony of ordinary (nonaccomplice) witnesses. If La.R.S. 15:496 and 497 were held to be controlling where the corroboration of an accomplice witness was sought by a prior consistent statement, La.R.S. 15:485 would be rendered partially meaningless.[4] Accordingly, we hold that La.R.S. 15:496 and 497 are not controlling in this case.[5] State v. Benton *710 did not involve the testimony of an accomplice and, thus, also is not controlling.
This assignment of error is without merit.
DECREE
For the foregoing reasons, the conviction and sentence are affirmed.
AFFIRMED.
SHORTESS, J., dissents with reasons.

. At the trial, the main thrust of Owens’ objection to the admissibility of Lewis’ prior consistent statement was that the statement was hearsay; La.R.S. 15:496 and 497 were not specifically urged as the basis of the objection. The hearsay portion of the objection is without merit. As observed in State v. Marcal, 388 So.2d 656, 660 (La.1980), "La.R.S. 15:496 does not create an exception to the hearsay rule, but rather details the requisite foundation for allowing the introduction of a prior consistent statement the fact of which is offered as corroboration.” Hearsay is in-court testimony of a statement made out of court, which is offered to show the truth of the matter asserted therein and resting for its value upon the credibility of the out-of-court asserter. State v. Martin, 356 So.2d 1370 (La.1978). However, when an out-of-court statement is offered for a purpose other than to establish the truth of the assertion, the value of the statement as evidence does not depend on the credibility of the out-of-court asserter and the statement falls outside the scope of the hearsay exclusionary rule. State v. Martin, 458 So.2d 454 (La.1984). Thus, in the instant case, the evidence is offered to prove the fact that the statement was made (not the truth of the statement), and this fact hinges on the credibility of Loretta Carter (not the credibility of David Lewis). Based on the fact that the statement was made, it may be inferred that current testimony is true and, therefore, the evidence is not hearsay. Federal Rule of Evidence 801(d)(1)(B); D. Binder, Hearsay Handbook, § 2.14 Prior Consistent Statement of Witness, pp 49-55 and § 33 Prior Consistent Statement of Witness, pp 407-410 (2d Ed. 1983); E. Cleary, McCormick’s Handbook on the Law of Evidence, §§ 49 and 251, pp 102-107 and 601-604 (2d. Ed 1972).

. For examples of factual settings in which this problem has occurred, see State v. St. Amand, 274 So.2d 179 (La.1973) and Baltzar v. Missouri Pacific Railraod, 406 So.2d 324 (La.App. 3rd Cir.1981).

. Where a witness gives inconsistent statements about the same fact, his credibility is inherently being assailed as to that particular fact.

. In Bunch v. Town of St. Francisville, 446 So.2d 1357, 1360 (La.App. 1st Cir.1984), appears the following:
When interpreting a law (ordinance), the court should give it the meaning the lawmaker intended. It is presumed that every word, sentence or provision in the law was intended to serve some useful purpose, that some effect is to be given to each such provision, and that no unnecessary words or provisions were used. Conversely, it will not be presumed that the lawmaker inserted idle, meaningless or superfluous language in the law or that it intended for any part or provision of the law to be meaningless, redundant or useless. The lawmaker is presumed to have enacted each law with deliberation and with full knowledge of all existing laws on the same subject. The meaning and intent of a law is to be determined by a consideration of the law in its entirety and all other laws on the same subject matter, and a construction should be placed on the provision in question which is consistent with the express terms of the law and with the obvious intent of the lawmaker in enacting it. Where it is possible to do so, it is the duty of the courts in the interpretation of laws to adopt a construction of the provision in question which harmonizes and reconciles it with other provisions. A construction of a law which creates an inconsistency should be avoided when a reasonable interpretation can be adopted which will not do violence to the plain words of the law and will carry out the intention of the lawmaker.

. If La.R.S. 15:496 and/or 497 were controlling, a very complex factual situation would have to be resolved. Lewis was impeached by a prior conviction for theft (La.R.S. 15:495), by bias and special interest through his plea bargain (La.R. S.15:492) and by the prior inconsistent statement. Impeachment by a prior conviction only attacks a witness’ general credibility and does not assail a particular fact as required by La.R. S. 15:496. Query: Does impeachment by bias and special interest through a plea bargain assail the particular fact that an accomplice implicates a defendant in the crime charged? The answer to this question is apparently yes. In State v. Knapper, 458 So.2d 1284, 1287 (La.1984), appears the following:
La.R.S. 15:496 permits corroboration (by prior consistent statements) only after impeachment, because corroboration prior to impeachment is usually unnecessary. Nevertheless, the witness in this case had been impeached during cross-examination on the basis of bias and interest as an accomplice who was awaiting sentence sifter a guilty plea. See 4 Wigmore, Evidence § 1128 (Chadbourn rev. 1972).
Query: Was Lewis’ prior consistent statement to his sister in a hospital room after his arrest "made at an unsuspicious time" or "given under the influence of some improper or interested motive, or to be a recent fabrication”? In State v. Hoofkin, 476 So.2d 481 (La.App. 1st Cir.1985), it was held a prior statement was not made at an unsuspicious time where a five-year old rape victim gave a tape recorded statement in the defense counsel’s office in the presence of the defendant and the defendant's sister, brother and nephew. In State v. Benton, it was observed in dictum that the defendant’s exculpatory statement was given at a suspicious time because the statement was given after the police confronted him, informed him of the rape complaint and advised him of his rights, and, therefore, the knowledge that he was a rape suspect produced a motive for making an exculpatory statement to the police. In Knapper, an accomplice made a prior consistent statement to his mother which implicated the defendant and himself; the court in Knapper, 458 So.2d at 1287 found the statement was not made at a suspicious time with the following rationale:
*710 As to the "unsuspicious time" argument, Williams’ conversation with his mother occurred two days before his arrest and several weeks after the crime. Williams ’ mother knew that defendant had been arrested and that the police were looking for her son. Defense counsel therefore argues that the timing of the statement was suspicious and that the statement lacked reliability in that the statement could be explained as an attempt by Williams to mollify his mother.
While the timing of the statement was not completely unsuspicious, the statement was made long before any plea bargaining began. More importantly, the statement was made before suggestions by other persons had intervened. At the time of the statement, there was no reason for Williams to name defendant as his companion unless the two were together that evening, and to that extent the statement does not lack reliability. Moreover, the importance of the statement to this case was not to show Williams’ lack of complicity for the crime, but rather was to show defendant's presence with Williams at the time of the robbery attempt at the hotel near the Super-dome. As to that point, the statement had much indicia of reliability because Williams implicated himself as a participant in the incident for which defendant had been arrested, and that declaration against his own interest enhanced the reliability of the statement. [Emphasis added.]
Finally, the evidence is unclear about whether Lewis' prior consistent statement to Carter was given before or after his prior inconsistent statement to Delaune. Lewis testified he gave his first statement to Delaune (which exculpated the defendant) while he was at the East Ascension Hospital in Gonzales, and that he gave the second statement to Delaune (which incriminated the defendant) at the Earl K. Long Hospital. Lewis testified De-laune was the first police officer to whom he talked. Lewis was not questioned about his statement to Loretta Carter or about when he was tranferred from the East Ascension Hospital to the Earl K. Long Hospital. No hospital records were introduced into evidence. Loretta Carter testified that she went to see Lewis at the Earl K. Long Hospital on the day he was arrested (September 22, 1985) and the following day (September 23, 1985). Her testimony is unclear about whether Lewis made the prior consistent statement (which incriminated Owens) to Carter on the first day or the second day or at what time the statement was made. Deputy Delaune testified that he arrived at the scene of the crime at 8:28 a.m. on September 22, 1985, and, at that time, David Lewis was being loaded in an ambulance to be brought to the hospital. Delaune took his first (inconsistent) statement from Lewis on the morning of September 23, 1985, at the East Ascension Hospital. The foundation objection that the prior consistent statement was made after the prior inconsistent statement was not raised in the trial court. La.C.Cr.P. art. 841; State v. Waymire, 504 So.2d 953 (La.App. 1st Cir.1987) and the cases cited therein.